UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EDWARD A. PERUTA, on behalf of himself     :
and other persons similarly situated,      :
    PLAINTIFFS,                            :
                          :
v.                                         :     CIVIL ACTION NO.
                          :     3:09-cv-1946 (VLB)
CITY OF HARTFORD,                          :
    DEFENDANT.                             :     August 24, 2012

## MEMORANDUM OF DECISION GRANTING DEFENDANT CITY OF HARTFORD'S MOTION FOR SUMMARY JUDGMENT [Dkt. # 52]

The Plaintiff, Edward A. Peruta, brings this action for an injunction on behalf of himself and other persons similarly situated to enjoin the operation of the Pay and Display Parking Meter System (hereinafter the "P&D System") in Hartford, Connecticut, and to prohibit and restrain the Defendant, the City of Hartford (hereinafter "the City"), from issuing parking citations and collecting fines and penalties for failure to deposit funds in parking pay stations installed by the City as part of the P&D System.  The Plaintiff also seeks compensatory and punitive damages.  The Plaintiff alleges that the P&D System violates his rights under the Fourth, Fifth, and Fourteenth Amendments and Article VI, Section II of the United States Constitution as enforced by 42 .U.S.C. § 1983, claiming deprivation of his rights to substantive (Count 1) and procedural due process (Count 2) in connection with his right to travel, violations of the Supremacy Clause (Count 3), false arrest and malicious prosecution (Court 5).  In addition, the Plaintiff asserts a state law claim for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b et seq. ("CUTPA") (Count 4).  Before

the Court is the City's Motion for Summary Judgment as to all of Plaintiff's claims as stated in Plaintiff's Amended Complaint.  For the reasons stated below, the Court construes the Motion for Summary judgment as a Motion for Judgment on the Pleadings.  The Court agrees with the City of Hartford that Plaintiff cannot state a claim for which relief can be granted, and for that reason, Plaintiff's present action as to all claims is accordingly DISMISSED and the Court GRANTS Defendant's dispositive motion.

### Facts

Before setting forth the factual background, the Court notes that in support of its Motion for Summary Judgment, the City of Hartford submitted a Local Rule 56(a)1 Statement with a total of two numbered paragraphs, both of which cited solely to the unverified Amended Complaint which fails to satisfy the requirements under Local Rule 56(a)3. [Dkt. # 52-2].  Local Rule 56(a)3  requires that "[e]ach statement of material fact by a movant in a Local Rule 56(a)1 Statement . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local Rule 56(a)3.  The unverified Amended Complaint is not an affidavit or evidence that would be admissible at trial and is therefore insufficient to support a motion for summary judgment.  Further, the City's arguments on its motion for summary judgment are based on the Amended Complaint's allegations and therefore the Court construes the City's Motion for Summary Judgment as a Motion for Judgment on the Pleadings. The following facts are provided as alleged by Plaintiff in the Amended Complaint.  [Dkt. # 32].

The City of Hartford is a Connecticut municipality as defined under General Statutes §§ 7-148(a), 7-202, having the power to establish regulations for on-street parking. [*Id.* at ¶ 9]. The Municipal Code of the City of Hartford ("Municipal Code") defines a "parking meter" as "a mechanism having a visible time indicator, a coin-receiving and a coin-actuating mechanism, all enclosed and mounted on top of a post." Municipal Code, § 22-1. [Dkt. # 32, Amended Complaint at ¶ 1]. In 2008, the Hartford Parking Authority ("HPA") implemented the replacement of coin operated parking meters with a "Pay and Display Parking Meter System" ("P&D System") which accepts multiple forms of payment through parking pay stations serving multiple parking spaces. [*Id.* at ¶ 2].

Plaintiff alleges that the City, the HPA acting in the City's name and in accordance with the City's delegation of statutory power to the HPA, and Central Parking System of Connecticut, Inc. ("Central Parking"), under authority delegated by the HPA in the City's name and in accordance with the City's delegation of statutory power to the HPA, by and through three individual Parking Controllers employed by the City and twelve individual Parking Enforcement Officers employed by Central Parking, in the implementation, maintenance, and operation of the P&D System, exceeded applicable statutory powers to enforce parking regulations, as codified in ordinances passed by the Hartford Court of Common Council ("City Council"), and failed to meet the national uniform standards for traffic control devices, as supplemented by state standards, for providing notice of traffic laws and regulations." [*Id.* at ¶ 3].

Plaintiff Edward A. Peruta conducts business in the City of Hartford and purports to bring this action on behalf of himself as "representative of the class of persons receiving notice that a vehicle owned or operated by Plaintiff or such members of the class has been parked unlawfully in a single parking space subject to the P&D System." [*Id.* at ¶ 4].

The regulation of the City's on-street parking is codified in the Municipal Code at Chapter 22, "Motor Vehicles and Parking."[*Id.* at ¶ 10].  Section 22-61 of the Municipal Code authorizes the City's traffic authority to regulate on-street parking. It specifically authorizes the authority to install parking meters, designate parking meter zones, fix the zone parking fees and times, designate the hours during which the use of parking meters shall be required. [*Id.* at ¶ 11].

The Hartford City Council has the sole authority to amend the parking regulations including amending the Municipal Code, § 22-26(a). The City Council passed an ordinance on May 26, 2009, approving an increase in on-street parking fines and penalties. [*Id.* at ¶ 12].

The HPA assumed responsibility for enforcement of the City's parking regulations on or about February 15, 2006, specifically the assumption of all parking-related duties of the traffic engineer as delineated in Chapter 22 of the Municipal Code, including the authority to use parking meters to regulate and control on-street parking. [*Id.* at ¶ 13]. The HPA exercises all powers in the name of the City in accordance with Conn. Gen. Stat. § 7-204. [*Id.* at ¶ 14].

In 2005, the HPA published a Request for Proposals (RFP) to privatize the management and operation of on-street parking in the City through

4

implementation of a Comprehensive and Integrated On-Street Parking and Citation Management System ("On-Street Parking System"). [*Id*. at ¶ 18]. Central Parking System of Connecticut, Inc. is a Tennessee corporation engaged in the business of parking management authorized to do business in Connecticut with its principal place of business located in Knoxville, Tennessee. [*Id*. at ¶ 17].  The HPA, acting in the name of the City, awarded Central Parking a five-year contract to implement, operate, and maintain the On-Street Parking System ("Contract"). [*Id*. at ¶¶ 19-20]. The Parking Enforcement Officers employed by Central Parking and the Parking Controllers employed by the City of Hartford implemented the P&D System at all times alleged under the Amended Complaint, under the authority of Municipal Code, §§ 22-25(a), 22-26, by attaching to a vehicle alleged as parked in violation of a City ordinance or regulation a notice to the owner or operator thereof stating that such vehicle has been parked unlawfully and assessing fines and penalties. [*Id*. at ¶ 22-27].

Plaintiff alleges that "[t]raffic control devices are defined as all signs, signals, markings, and other devices used to regulate, warn, or guide traffic, placed on, over, or adjacent to a street, highway, pedestrian facility, or bikeway by authority of a public agency having jurisdiction," and that the "purpose of traffic control devices, as well as the principles for their use, is to promote highway safety and efficiency by providing for the orderly movement of all road users on streets and highways throughout the United States." [*Id*. at ¶¶ 28-29]. Plaintiff alleges that "[t]raffic control devices notify road users of regulations and provide warning and guidance needed for the reasonably safe, uniform, and

efficient operation of all elements of the traffic stream." [*Id*. at ¶ 30]. Plaintiff further alleges that "[r]egulatory signs provide notice of traffic laws or regulations, including laws and regulations regarding parking," and that "[s]igns that regulate the parking of vehicles are regulatory and must contain legible reference to applicable regulations and conform to the standards of shape, color, and location for regulatory traffic control device signs." [*Id*. at ¶¶ 31-32].

Plaintiff alleges that the U.S. Secretary of Transportation decrees that traffic control devices on all streets and highways be in "substantial conformance" with the Manual on Uniform Traffic Control Devices ("MUTCD"), which is approved by the Federal Highway Administration ("FHWA") as the "national standard" for the design and application of all traffic control devices. [*Id*. at ¶¶ 33-34]. Plaintiff alleges that the Connecticut State Traffic Commission (STC) supplements MUTCD with sections 14-298-500 through 14-298-554, inclusive, of the Regulations of Connecticut State Agencies. [*Id*. at ¶¶ 35-36]. Plaintiff further notes that the City of Hartford regulates and collects revenues from parking meters and enforces rules regarding meters and on-street parking throughout the City under the authority of Municipal code § 10-1 and Conn. Gen. Stat. § 7-207a, and as provided in Chapter 22 of the Municipal code. [*Id*. at ¶¶ 37-38].

Plaintiff also alleges that Section 2B-40 of MUTCD

requires that parking signs state applicable regulations and conform to the national uniform standards of shape, color, dimensions, legends, illumination or reflectorization, and location, including:

> **(a)** Where only limited time parking or parking in a particular manner are permitted, the signs, designated "Permissive Parking Signs," shall have a green legend and border on a white background.
> **(b)** The shape for regulatory parking signs shall be rectangle, ordinarily with the longer dimension vertical with a minimum standard size of twelve inches by eighteen inches.
> **(c)** Regulatory signs shall be reflectorized or illuminated to show the same shape and color both by day and night.
> **(d)** A regulatory sign normally is placed where its mandate or prohibition applies or begins with clearance from the pavement to the bottom of the sign shall be at least seven (7) feet.
> **(e)** A regulatory sign is mounted approximately at right angles to the direction of, and facing, the traffic it is intended to serve.

[*Id.* at ¶ 39].

In July 2010 the City of Hartford discussed a meter audit that identified inconsistencies with signage placement and clarity and the location of P&D System meters. [*Id.* at ¶ 40]. The City of Hartford determined as a result of the meter audit to continue working with the City's Department of Public Works to address and implement necessary improvements to inconsistencies in signage placement and clarity and the location of P&D System meters. [*Id.* at ¶ 41].

Plaintiff found a notice attached to his vehicle on September 28, 2009, in the vicinity of 505 Hudson Street, Hartford, alleging that his failure to deposit funds in a parking pay station erected by the City of Hartford as part of the P&D System constituted unlawful parking. [*Id.* at ¶ 42]. The area where Plaintiff parked contained no regulatory parking signs. [*Id.* at 43]. Plaintiff alleges he received no notice that permissive parking regulations applied to the area where he parked. [*Id.* at 44].

Plaintiff alleges he reasonably believed at the time when he parked in the vicinity of 505 Hudson Street, Hartford, on September 28, 2009, that the absence

and/or removal of the mechanisms having visible time indicators, coin-receiving and a coin-actuating mechanisms, all enclosed and mounted on top of posts, otherwise defined as "parking meters" in the Municipal Code, indicated that parking in that area was unrestricted and unconditional. [*Id.* at ¶ 45]. In fact, the coin-receiving and coin-actuating mechanisms had been chopped off of their posts. [*Id.* at 46]. Plaintiff's parking citation was dismissed following a hearing held before a hearing officer on October 28, 2009. [*Id.* at 47].

Plaintiff alleges that the P&D System in place at 505 Hudson Street on September 28, 2009, at the location where Plaintiff parked, and throughout the City of Hartford, did not meet the notice standards set forth in MUTCD and the Municipal Code, including the standards set forth in subparagraphs 39(a) through 39(e), above. [*Id.* at ¶ 48-49]. Plaintiff filed this action in the Connecticut Superior Court on November 4, 2009 and the Defendant removed the action to federal court on November 30, 2009.

**Legal Standard**

The standard for judgment on the pleadings is essentially the same as the standard applied to a motion to dismiss under the Federal Rules of Civil Procedure. *See Johnson v. Rowley*, 569 F.3d 40, 43-44 (2d Cir. 2009). "The Court must accept as true all of the factual allegations in the complaint—which is deemed to include any written instrument attached to the complaint as an exhibit, any materials incorporated into it by reference, and any other documents that are integral to it, and must draw all reasonable inferences from those factual allegations in the plaintiff's favor." *Derisme v. Hunt Leibert Jacobson, P*, No.10-cv-244(MRK), 2010 WL 4683916, at *1 (D. Conn. Nov. 10, 2010). The Complaint

8

must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). A claim to relief is plausible on its face "when the plaintiff pleads fact[s] ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009).

<u>Analysis</u>

i.      **Right to Travel**

Plaintiff, in Count 1 of his Amended Complaint, alleges that "[t]he City of Hartford's unlawful conduct in issuing parking citations to persons without adequate notice of the conduct prohibited, when federal and state statutes provide specific, detailed and mandatory directives for the provision of such notice, has deprived such persons at the time of the citation and so long as the lack of notice remains, of the right to travel freely to, from, and within the City of Hartford without fear of citation." [Dkt. # 32 at ¶ 54].  The Court finds that the alleged "inadequate notice/signage" and issuance of a parking ticket does not impermissibly burden the fundamental right to travel in a constitutional sense as Plaintiff contends.

The Supreme Court has long recognized a fundamental right to interstate travel. *United States v. Guest,* 383 U.S. 745, 757 (1966) ("The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union."). "[T]his right to travel has a long history of recognition as a right to personal mobility, a right derived from several provisions of the Constitution." Ronald D. Rotunda & John E. Nowak, *Treatise on*

9

*Constitutional Law* § 15.7 (2007). It is true that "[t]he word 'travel' is not found in the text of the Constitution. Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (quoting *United States v. Guest,* 383 U.S. 745, 757 (1966)). "Although the Supreme Court has suggested that '[t]he textual source of the constitutional right to travel, or, more precisely, the right of free interstate migration, ... has proved elusive,' it has protected that right by invoking both the Privileges and Immunities Clause of the Fourteenth Amendment and the Equal Protection Clause." *Selevan v. New York Thruway Authority*, 584 F.3d 82, 99 (2d Cir. 2009) (quoting *Att'y Gen. N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986)).  The Supreme Court has recognized that "[t]he right of 'free ingress and regress to and from' neighboring States, which was expressly mentioned in the text of the Articles of Confederation, may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'" *Saenz*, 526 U.S. at 501 (quoting *Guest*, 383 U.S. at 758). In any event, the right to travel has been "firmly established and repeatedly recognized." *Guest*, 383 U.S. at 757.

The right to travel "embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz*, 526 U.S. at 500. "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when

**10**

it uses 'any classification which serves to penalize the exercise of that right.'"
*Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986). The
Supreme Court's right to travel cases have principally involved classification
according to durational residency requirements. *See, e.g., Saenz*, 526 U.S. 489
(durational residency requirements violate right to travel); *Soto-Lopez*, 476 U.S.
898 (New York's restriction of its civil service preference to veterans who entered
armed forces while residing in New York violated constitutionally protected right
to travel); *Shapiro v. Thompson*, 394 U.S. 618 (1969) (holding unconstitutional a
state or District of Columbia statutory provision denying welfare assistance to
residents of state or district who have not resided within their jurisdictions for at
least one year immediately preceding their applications for such assistance). *See
also Guest*, 383 U.S. 745 (allegation of conspiracy to prevent blacks from using
highway facilities); *Edwards v. California,* 314 U.S. 160 (1941) (invalidating a state
law that impeded the free interstate passage of the indigent); *Crandall v. State of
Nevada*, 73 U.S. 35 (1867) (invalidating a Nevada tax on every person leaving the
State by common carrier).

Although the Supreme Court has long recognized a fundamental right to
interstate travel, it has never explicitly held that constitutional protection extends
to intrastate travel. However the Second Circuit has recognized that the
constitutional right to travel includes intrastate, as well as interstate, travel. "It
would be meaningless to describe the right to travel between states as a
fundamental precept of personal liberty and not to acknowledge a correlative
constitutional right to travel within a state." *King v. New Rochelle Mun. Hous.*

*Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) (five-year residency requirement for admission to public municipal housing violates Equal Protection Clause). *See also Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (recognizing the "constitutional right to free movement within [a] [t]own" and noting that "[t]he right to intrastate travel, or what we sometimes will refer to as the right to free movement, has been recognized in this Circuit."); *Spencer v. Casavilla,* 903 F.2d 171, 174 (2d Cir.1990) (observing that this Circuit "has held that the Constitution . . . protects the right to travel freely within a single state"); *Williams v. Town of Greenburgh*, 535 F.3d 71, 75-76 (2d Cir. 2008) ("These precedents stand for the proposition that individuals possess a fundamental right to travel within a state. While the parameters of that right have not been sharply defined by our Court, it is clear that the right protects *movement between places* and has no bearing on *access* to a particular place.") (emphasis in the original).

The right to travel, like many constitutional rights, is not absolute.  Not every restriction on one's movement or ability to travel will impermissibly burden the right to travel in a constitutional sense.  When determining whether a fundamental right has been infringed, Courts look to whether there has been a direct and substantial interference with that right.  *See* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 816 (4th ed. 2011) (citing *Zablocki v. Redhail*, 434 U.S. 374 (1978)).  The Supreme Court has explained that the "nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which *unreasonably* burden or

restrict this movement."  *Shapiro*, 394 U.S. at 629 (emphasis added).   Courts have therefore consistently limited the constitutional right to travel to situations where something more than a mere minor restriction on one's ability to travel is at issue.

It is well established that "travelers do not have a constitutional right to the most convenient form of travel," *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007), and "minor restrictions on travel simply do not amount to the denial of a fundamental right." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 101 (2d Cir. 2009) (quoting *Town of Southold,* 477 F.3d at 54). *See also Kansas v. United States,* 16 F.3d 436, 442 (D.C.Cir.1994) (explaining that "something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied"); *Cramer v. Skinner,* 931 F.2d 1020, 1031 (5th Cir.1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification"); *City of Houston v. F.A.A.,* 679 F.2d 1184, 1198 (5th Cir.1982) (noting that passengers do not possess "a constitutional right to the most convenient form of travel"); *Miller v. Reed,* 176 F.3d 1202, 1205 (9th Cir.1999) (stating that "burdens on a single mode of transportation do not implicate the right to interstate travel" and that "minor burdens impacting interstate travel, *such as toll roads,* do not constitute a violation [of the right to travel]").

Courts have routinely held that reasonable fees or taxes on travel, including parking, do not impermissibly burden the constitutional right to travel. *See, e.g., Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405

U.S. 707, 714 (1972) (finding that a charge of one dollar levied by a state and municipality on persons enplaning a scheduled commercial airliner to help defray costs of airport facility did not violate right to travel.  "The principle that burdens on the right to travel are constitutional only if shown to be necessary to promote a compelling state interest has no application in this context.  The facility provided at public expense aids rather than hinders the right to travel. A permissible charge to help defray the cost of the facility is therefore not a burden in the constitutional sense."); *Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011) (Manhattan's differential parking tax scheme did not implicate the fundamental right to travel. "[T]he rights asserted [here] can hardly be seen as fundamental in the relevant sense. The exemption burdens but one mode of travel, and not that drastically."); *Lauran v. U.S. Forest Serv.*, 141 F. App'x 515, 520 (9th Cir. 2005) ("A five-dollar vehicle parking fee, charged for recreational use of the National Forest, does not constitute a barrier to intrastate or interstate travel."); *Lai v. New York City Gov't*, 991 F. Supp. 362, 366 (S.D.N.Y. 1998) *aff'd*, 163 F.3d 729 (2d Cir. 1998) (finding no violation of right to travel in action where New Jersey resident who held disabled parking permit was ticketed for parking at an expired meter as it cannot be said that "by failing to allow plaintiff to park in 'no parking' or metered zones, the City had erected an actual barrier to interstate travel . . . [and] [t]hus though plaintiff's *ability* to travel is limited by her physical condition and the shortage of on-street parking spaces in New York City, her *right* to travel has not been abridged by the City's parking regulations.").

Courts have typically considered parking to be a privilege and not a fundamental right in its own respect. *See, e.g., Dist. of Columbia v. Smith*, 93 F.2d 650, 651 (D.C. Cir. 1937) ("The power to regulate the use of streets and highways by restrictions on the parking of vehicles is one universally recognized, and its reasonable exercise is consistently upheld."); *Gardner v. City of Brunswick*, 197 Ga. 167, 172, 28 S.E.2d 135, 138-39 (1943) ("while the public has an absolute right to the use of the streets for their primary purpose, which is for travel, the use of the streets for the purpose of parking automobiles is a privilege, and not a right; and the privilege must be accepted with such reasonable burdens as the city may place as conditions to the exercise of the privilege. . . . Much should be left to the city's discretion."); *Gillam v. Landrieu*, 455 F.Supp. 1030 (E.D. La.1978) ("A vehicle owner who . . .  parks overtime at a meter is not effectuating a constitutionally protected right."); *Dep't of Highways v. Capone*, 298 So. 2d 94, 97 (La. Ct. App. 1974) ("We believe it elementary that no person, be he property owner or not, has the absolute, inalienable and unqualified right to utilize a public street for parking purposes. To the contrary, parking on public thoroughfares is a privilege enjoyed by the public at large, subject, of course, to reasonable regulation under proper exercise of the police power."); *Yegen v. City of Bismarck*, 291 N.W.2d 422, 425 (N.D. 1980) ("No person has the absolute, unqualified right to utilize a public street for parking purposes. Parking on public thoroughfares is not a right, but a privilege to be enjoyed by the public at large subject to reasonable regulations under the police power."); *Hickey v. Riley*, 177 Or. 321, 162 P.2d 371, 375 ("Parking is not a right, but a privilege, and, as such, is

subject to reasonable regulation under the police power."); *Hickey v. Riley*, 177 Or. 321, 332-33, 162 P.2d 371, 375-76 (1945) ("The use of parking meters has been generally approved by the courts. . . . The imposition of a parking fee for regulatory purposes has likewise been approved generally."); *Galvis v. State, Dept. of Transp.*, 140 Wash. App. 693, 706-07, 167 P.3d 584, 590 (2007) (noting the "well-established authority that parking on the public right of way is a privilege, revocable by the State at any time"); *Sandona v. City of Cle Elum,* 37 Wash.2d 831, 840, 226 P.2d 889 (1951) (parking on the street is a privilege, not a right); *Kimmel v. City of Spokane,* 7 Wash.2d 372, 376, 109 P.2d 1069 (1941) ("[T]he power of the state . . . to regulate the parking of cars on the streets and highways can not [sic] be doubted.")

In the present case, it cannot be said that Plaintiff was deprived of his constitutional right to travel considering that "minor restrictions on travel simply do not amount to the denial of a fundamental right." *Selevan*, 584 F.3d at 101. Here, Plaintiff parked without paying the required fee at the P&D system which resulted in the issuance of parking ticket requiring the payment of a higher fee to park.  The parking ticket was simply a monetary differential cost to park.  There were no corollary penalties such as license revocation, impoundment of Plaintiff's vehicle, or criminal notations on Plaintiff's driving record. The requirement that Plaintiff pay a higher fee to park as a result of the parking ticket, irrespective of whether Plaintiff had notice or not of the P&D system, is by all reasonable inferences, a minor restriction on Plaintiff's right to travel, at most.

*See Selevan v. New York Thruway Auth.*, 584 F.3d 82, 101 (2d Cir. 2009); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007).

Further, the issuance of the parking ticket can be seen to be a type of differential parking tax scheme which the Second Circuit has already held does not infringe on the constitutional right to travel.  The Second Circuit found that a challenge to Manhattan's differential parking tax scheme asserted rights that "can hardly be seen as fundamental in the relevant sense" as the tax "exemption burdens but one mode of travel, and not that drastically."  *Joseph*, 659 F.3d at 219.  The Second Circuit further noted that there is "no authority that the right to park one's vehicle at a particular rate relative to others is sufficiently fundamental to trigger protection under the Privileges and Immunities Clause."  *Id.*  Likewise, the City's issuance of a parking ticket in the present case is effectively a differential fee or tax to park which burdens at most a single mode of travel, but not that drastically as to amount to the denial a fundamental right in a constitutional sense.

Even assuming that Plaintiff had no notice as he contends of the then-new P&D system, the issuance of the parking ticket without said notice still does not amount to a denial of a fundamental right as the ticket is still nothing more than a minor restriction on travel.  It is worth noting here the general principle that ignorance of the law is no excuse, which is deeply embedded in our jurisprudence. *Cheek v. United States*, 498 U.S. 192, 199, (1991) ("The general rule that ignorance of the law or a mistake of law is no defense . . . is deeply rooted in the American legal system."); *Lambert v. People of the State of California*, 355

U.S. 225, 228, (1957) ("The rule that ignorance of the law will not excuse is deep in our law, as is the principle that of all the powers of local government, the police power is one of the least limitable.") (internal quotations and citations omitted). Essentially, Plaintiff's claim is that the lack of notice/signage deprived him of his ability to pay the lower parking rate at the meter rather than the higher parking fine. If he had adequate notice of the required parking fee in that particular spot either through adequate signage or the Municipal Code, Plaintiff's argument implies, then he would have had the opportunity to pay the parking meter rate instead of receive a ticket and have to pay a higher rate in the form of a fine. However, the Plaintiff has not cited nor has the Court found any authority that payment of a ticket in itself infringes on a constitutional right.  Here Plaintiff's notice arguments are essentially an argument that he had a constitutional right to park his vehicle at a particular rate.  However as the Second Circuit held, there is simply "no authority that the right to park one's vehicle at a particular rate relative to others" is constitutionally protected. *Joseph*, 659 F.3d at 219.  Paying to park is one of the everyday nominal costs of doing business in or living in the City of Hartford and other cities across the country and is at most a minor restriction on travel.

The Court also notes that if it followed Plaintiff's logic to its natural conclusion, the court would find constitutional violations in innumerable circumstances, for example, where a tree blocks a parking sign because the city did not trim the tree in a timely manner or where the state fails to post speed limit signs every twenty feet on the highway. Such a result is unworkable and would

18

illogically distort the fundamental right to travel into an unrecognizable shell of its current formulation. "If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007). Notice or no notice, the alleged "burden" imposed on Plaintiff in this case does not rise to the level that would implicate the fundamental right to travel.

### ii.     Substantive Due Process (Count 1)

The United States Supreme Court has held that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const., amend. XIV, § 1, in order to "guarante[e] more than fair process," *Washington v. Glucksberg,* 521 U.S. 702, 719 (1997). The Court has further held the Due Process Clause "to cover a substantive sphere as well," *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998), "barring certain government actions regardless of the fairness of the procedures used to implement them," *Daniels v. Williams,* 474 U.S. 327, 331, (1986); *see also Zinermon v. Burch,* 494 U.S. 113, 125, (1990) (noting that substantive due process violations are actionable under § 1983).

Substantive due process embodies society's desire to "prevent government from abusing [its] power, or employing it as an instrument of oppression." (internal quotations omitted.) *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992). However, the Court has "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional

19

sense,'" *Id.* at 129. Government conduct that violates substantive due process is "conduct that shocks the conscience and violates the decencies of civilized conduct." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172-173 (1952). Conscious-shocking conduct "do[es] more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically" and is "bound to offend even hardened sensibilities." *Rouchin*, 342 U.S. at 172.

     *Rouchin v. California* established the "shocks the conscience" test in the realm of substantive due process litigation, where the Court found that the forced pumping of a suspect's stomach was enough to offend due process because it shocked the conscience and violated the decencies of civilized conduct. *Rouchin*, 342 U.S. at 172-73. Since then the Court has "repeatedly adhered" to the benchmark set by *Rouchin. Lewis*, 523 U.S. at 847. *See, e.g., Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957) (reiterating that conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986) (same); *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty' ") (quoting *Rochin v. California, supra,* at 172, and *Palko v. Connecticut,* 302 U.S. 319, 325–326 (1937)); *Collins v. Harker Heights, supra,* at 128, (holding that the substantive

component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense"); *Daniels v. Williams*, 474 U.S. 327, 331-32, 106 S. Ct. 662, 665, 88 L. Ed. 2d 662 (1986) (noting that "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" and that "[t]o hold that injury caused by such [lack of due care or negligent conduct] is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983, 77 L. Ed. 2d 605 (1983) (finding that deliberate indifference is egregious enough to state a substantive due process claim in the context of deliberate indifference to the medical needs of pretrial detainees); *Lewis*, 523 U.S. at 834 ("In the circumstances of a high-speed chase aimed at apprehending a suspected offender, where unforeseen circumstances demand an instant judgment on the part of an officer who feels the pulls of competing obligations, only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the shocks-the-conscience test. Such chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to substantive due process liability. . . . [T]here is no reason to believe that [the officer's enforcement considerations] were tainted by an improper or malicious motive."); *Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (officer's interrogation of suspect in hospital did not arise to level or conscious-shocking or egregious

where no evidence that officer acted purposely to harm suspect by intentionally interfering with his medical treatment).

Notice or no notice of the P&D system, the City of Hartford's conduct as alleged by Peruta does not rise to the level of egregiousness that "shocks the contemporary conscience." It cannot be said that the City's conduct, in giving Plaintiff a parking ticket for failing to pay, even assuming the plaintiff did not have actual or constructive notice that he had to pay for parking, was "arbitrary," "malicious," or "brutal" in the constitutional sense, particularly where Plaintiff's ticket was ultimately dismissed and he did not have to pay a fine. Nor has Plaintiff alleged there was any improper motive or purposeful harm. *See, e.g., Franceschi v. City of Seal Beach*, No.92-5529, 1993 WL 340449, at *1 (9th Cir. 1993) (holding that a "traffic citation without arrest is not the type of police behavior which 'shocks the conscience.'") (Citation omitted); *Kelly*, 375 F.Supp.2d at 209 (S.D.N.Y. 2005) ("Nothing about the issuance of a parking ticket implicates the rarely-used doctrine of 'substantive due process.'") (Citation omitted). To find that the conduct here alleged "shocks the conscience" would be a clear departure from settled and carefully developed Supreme Court precedent in the area of substantive due process, an avenue which this Court has no reason to take in this case. "To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Consequently, Plaintiff's Substantive Due Process claim (Count 1) must also be dismissed on this basis.

### iii.     Count 2: Procedural Due Process

Assuming arguendo that Plaintiff's constitutional right to travel was implicated, Plaintiff fails to state a plausible claim for relief under procedural due process.  Plaintiff alleges in Count 2 a violation of his right to procedural due process under Amendments Five and Fourteen of the U.S. Constitution as enforced by 42 U.S.C. § 1983. [Dkt. # 32, at ¶¶ 58-68]. Plaintiff claims that the "lack of adequate notice of the conduct prohibited denied Plaintiff . . . of a meaningful opportunity for hearing." [*Id.* at ¶ 64]. Plaintiff alleges that "[a]lthough the Municipal Code provides opportunity for hearing to contest a parking citation, so long as the P&D System remains, whether a person prevails at hearing or not, the restraint imposed by the threat of receiving a parking citation remains with such person." [*Id.* at ¶ 65]. Furthermore, alleges the Plaintiff, "[t]he egregious and shocking nature of the City of Hartford's conduct is such that no opportunity for hearing is adequate to redress a parking citation that is unlawfully issued." [*Id.* at ¶ 66]. The Court finds that Plaintiff has not plausibly pled a claim of a violation of procedural due process rights for which relief can be granted.

Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinerman v. Burch*,

494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990) (emphasis in

original). Due Process is a "flexible concept" that "varies with the particular

situation." *Id.* at 127. The Supreme Court has articulated a test to determine what

procedural protections the Constitution requires in a particular case:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or substitute
> procedural safeguards; and finally, the Government's interest, including
> the function involved and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In

applying this test, the Court usually has held that the Constitution requires a

hearing *before* the State deprives a person of liberty or property. *See, e.g.,*

*Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985) ("[T]he root

requirement of the Due Process Clause [is] that an individual be given an

opportunity for a hearing *before* he is deprived of any significant property

interest.") (emphasis in original). Indeed, "[a]n essential principle of due process

is that a deprivation of life, liberty, or property 'be preceded by notice and

opportunity for hearing appropriate to the nature of the case. *Id.* (quoting *Mullane*

*v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950)). "[T]he formality

and procedural requisites for the hearing can vary, depending upon the

importance of the interests involved and the nature of the subsequent

proceedings." *Id.* at 545.

"In order to sustain an action for deprivation of property without due

process of law, a plaintiff must 'first identify a property right, second show that

the state has deprived him of *that* right, and third show that the deprivation was effected without due process.'" *Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (quoting *Mehta v. Surles,* 905 F.2d 595, 598 (2d Cir.1990)). *See also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59, 119 S. Ct. 977, 989, 143 L. Ed. 2d 130 (1999). "[T]he availability of adequate pre-deprivation and post-deprivation remedies under state law will defeat a § 1983 action brought against state actors." *Rackley v. City of New York*, 186 F. Supp. 2d 466, 481 (S.D.N.Y. 2002).

In the present case Plaintiff has identified no property interest that has been deprived. He does not allege seizure of any of his property, including his money or automobile, as a result of his receipt of a parking ticket.  Plaintiff alleges that the City has deprived him of his fundamental right to travel but, as discussed above, the Court has concluded that there was no constitutionally impermissible burden on Plaintiff's right to travel.

Even assuming arguendo that Plaintiff was deprived of some property or liberty interest or even his constitutional interest in travel, Plaintiff cannot plausibly state a claim that such deprivation was effected without due process. Plaintiff cites to no authority and the Court has not found any that procedural due process requires more than the process Plaintiff allegedly received.  The Plaintiff cites no authority to support Plaintiff's argument that procedure due process required the City to use a particular type of signage regarding the P&D system.

On the contrary, Plaintiff admits that he exercised his right to a hearing and ultimately prevailed. [Dkt. # 32, Amended Complaint, at ¶ 47]. Because Plaintiff prevailed at the hearing and did not have to pay a fine, he cannot plausibly argue that he was deprived of due process. *See Kelly v. Rice*, 375 F.Supp.2d 203, 209 (S.D.N.Y. 2005) (holding that plaintiff did not allege facts showing violation of procedural due process in connection with the issuance of a parking ticket as "plaintiff got all the process she was due. She got a ticket; she fought the ticket in traffic court; she won and the summons was dismissed."). *Rackley*, 186 F. Supp. 2d at 480-85 (finding that plaintiff's procedural due process rights were not violated when car was seized by city where plaintiff had notice of remedies, ability to challenge tickets, and exercised right to pursue some possible remedies while failing to pursue other possible remedies). Here as was the case in *Kelly*, Plaintiff got a parking ticket, he fought the ticket, he won and the fine was dismissed.  Accordingly, Plaintiff's procedural due process claim must be dismissed on this basis.

iv.    **Count 3: Supremacy Clause**

Plaintiff alleges in Count 3 a § 1983 claim for a violation of the Supremacy Clause, Article VI, § 2 of the U.S. Constitution. Plaintiff alleges that MUTCD "creates a federal right to travel freely and be subject to the same notice of prohibited conduct throughout the United States" and that "[t]he violation of Plaintiff's civil right to travel freely and receive equal notice of prohibited conduct was precipitated by the official policy, custom, and usage by the City of Hartford." [Dkt. # 32, at ¶¶ 71-72]. First, the Court finds that Plaintiff's claim fails because he

has not identified a conflict between federal and state law, which is required for a valid Supremacy Clause claim.  Further, Plaintiff's claim appears to be predicated upon an alleged conflict between MUTCD and the City's actions in not providing appropriate parking signage in accordance with MUTCD.   This claim also fails because MUTCD is a form of guidance and a "standard" toward which states and municipalities should "substantially conform" rather than a strictly binding document.

The Supremacy Clause establishes that the U.S. Constitution, U.S. treaties, and laws made pursuant to the U.S. Constitution "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." U.S. Const., Art. VI, cl. 2. "It is a familiar and well-established principle that the Supremacy Clause invalidates state laws that 'interfere with, or are contrary to,' federal law. *Hillsborough County, Fla. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 712-13 (1985) (quoting *Gibbons v. Ogden,* 9 Wheat. 1, 211 (1824) (Marshall, C.J.) (internal citations omitted). Federal law may supersede state law through express congressional pre-emption or an inferred congressional intent to pre-empt in the absence of express language "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Id.* at 713 (internal quotations omitted). *See also Jones v. Rath Packing Co.,* 430 U.S. 519, 525, (1977); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947); *Hines v. Davidowitz,* 312 U.S. 52 (1941).

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County*, 471 U.S. at 713 (1985) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963); *Hines v. Davidowitz, supra,* 312 U.S., at 67). *See generally Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 698-699 (1984). "[S]tate laws can be pre-empted by federal regulations as well as by federal statutes." *Hillsborough County*, 471 U.S. at 713. "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Id.*

In order to assert a claim under the Supremacy Clause, Plaintiff must first identify a conflict between state and federal law. In the present case, despite claiming that "[t]his case indisputably involves conflict-preemption," Plaintiff has not identified such a conflict. Plaintiff has failed to identify any state or local law or regulation which conflicts with a federal act. Plaintiff instead appears to imply that the actions of the City of Hartford in failing to provide proper notice of its new P&D System violate MUDCT.  Consequently, Plaintiff has not plausibly stated a federal-state law conflict; at most, Plaintiff has asserted that the City has violated MUTCD by failing to post appropriate signage, which is not a proper basis for a Supremacy Clause claim. See *Springfield Hosp. v. Hoffman*, 09-CV-00254-CR, 2010 WL 3322716 (D. Vt. Apr. 9, 2010) (plaintiff's assertion that it was

not state legislation but officials' actions that failed to comply with federal law was not a valid claim under the Supremacy Clause, "which requires, as a condition precedent to its application, a state-federal law conflict"). *See also Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 884, 120 S. Ct. 1913, 1927, 146 L. Ed. 2d 914 (2000) ("[C]onflict pre-emption . . . turns on the identification of actual conflict. . . ."); *Livadas v. Bradshaw,* 512 U.S. 107, 120 (1994) (stating that the "Supremacy Clause requires" courts to "decide if a state rule conflicts with or otherwise stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the federal law."). Here Plaintiff has failed to identify the "actual conflict" between state and federal law which is a necessary condition precedent to establishing a Supremacy Clause claim.

Moreover, even assuming that the Plaintiff did identify a local law that allegedly conflicts with a federal regulation, there is no violation here because MUTCD is not a federal law. It is merely advisory, designed to provide guidance to states and municipalities and is not binding. Plaintiff alleges that MUTCD and in particular section 2B.40 of MUTCD "creates a federal right to travel freely and be subject to the same notice of prohibited conduct throughout the United States." [Dkt. # 32, at ¶¶ 71-72]. MUTCD is a document issued by the Federal Highway Administration ("FHWA") of the United States Department of Transportation that has been incorporated by reference into the Code of Federal Regulations. 23 C.F.R. § 655.601. The purpose of MUTCD is to encourage rather than to impose uniformity in traffic control devices across the nation and to

improve the safety and efficiency of the surface transportation system. (MUTCD, 2003 ed. Rev. 2, at I-I, § 1A.01).

MUTCD as approved by the FHWA is the "national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a)." 23 C.F.R. § 655.603(a). State or other federal agency MUTCDs must be in "substantial conformance" with the national MUTCD. 23 C.F.R. § 655.603(b)(1). States and other federal agencies, however, "are *encouraged* to adopt the National MUTCD in its entirety as their official Manual on Uniform Traffic Control Devices." 23 C.F.R. § 655.603(b)(2) (emphasis added).

The text of MUTCD indicates that it is primarily a form of guidance rather than a binding document. Section 1A.02, titled "Principles of Traffic Control Devices" provides that "This Manual contains the *basic principles* that govern the design and use of traffic control devices for all streets and highways open to public travel" and notes that importance of giving these principles "*primary consideration* in the selection and application of each device." (emphasis added). MUTCD's introductory sections demonstrate further that the purpose and intent of the document is to provide standards of guidance for states and municipalities to follow, rather than mandatory, binding rules.  For example, Section 1A.04, titled "Placement and Operation of Traffic Control Devices" provides as follows:

> *Guidance*:
> Placement of a traffic control device *should* be within the road user's view so that adequate visibility is provided. To aid in conveying the proper meaning, the traffic control device *should* be appropriately positioned with respect to the location, object, or situation to which it applies. The location

and legibility of the traffic control device *should* be such that a road user has adequate time to make the proper response in both day and night conditions.

Traffic control devices *should* be placed and operated in a uniform and consistent manner.

MUTCD, § 1A.04 (emphasis added).

Plaintiff relies on section 2B of MUTCD in support of his Supremacy Clause claim which provides "standards" for regulatory signs.  Section 2B.39 entitled "Parking, Standing and Stopping Signs" expressly states that "Signs governing the parking, stopping, and standing of vehicles cover a wide variety of regulations, and *only general guidance can be provided here.*" §2B.39 (emphasis added).   Although Section 2B.40 regarding the "design of parking, standing, and stopping signs" which Plaintiff relies on uses the term "shall" as opposed to "should,"[1] Section 2B.39 makes clear that Section 2B.40 is merely general guidance and is not meant to be controlling or binding.   It is therefore clear based on the express terms, structure, and context of MUDCT that it poses nothing more than a form of guidance for states and local municipalities to follow in the design and placement of regulatory, including parking, signs.  See *also Wasserman v. City of New York*, 802 F. Supp. 849, 855 (E.D.N.Y. 1992) *aff'd*, 60 F.3d 811 (2d Cir. 1995) (finding no liability on city for placement of signs allegedly in violation of MUTCD because suggested advance posting distances were

---

[1] Section 2B.40 provides that the "the legend on parking signs shall state applicable regulations. Parking signs shall conform to the standards of shape, color, and location.  Where parking is prohibited at all times or at specific times, the basic design for parking signs shall have a red legend and border on a white background (Parking Prohibition signs). Where only limited-time parking or parking in a particular manner are permitted, the signs shall have a green legend and border on a white background (Permissive Parking signs)."  MUTCD, § 2B.40.

"guides").  MUTCD should therefore be viewed more as an aspirational guide, like uniform building codes.  Since MUTCD is not controlling or binding, it cannot support a plausible Supremacy Clause claim.  Accordingly, Plaintiff's Supremacy Clause claim (Count 3) must be dismissed because Plaintiff has not plausibly stated a claim for which relief can be granted.

Lastly, to the extent that Plaintiff is really alleging that the City violated MUDTC and assuming MUDTC was binding, Plaintiff would not have a private right of action to bring such a challenge directly.  "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). The task in determining whether a private right of action exists is limited solely to determining whether Congress intended to create a private right of action. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). Courts often rely on several factors to determine legislative intent, including whether the plaintiff is part of the class of persons "for whose especial benefit" the statute was enacted, whether the legislative history suggests that Congress intended to create a cause of action, whether granting an implied cause of action would support the underlying remedial scheme set down in the statute, and whether the cause of action is one traditionally relegated to state law in an area of state concern so that it would be inappropriate to infer a cause of action based solely on federal law. *Touche Ross*, 442 U.S. at 576 (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975). "The ultimate question," however, "is one of legislative intent, not one of whether this Court thinks that it can improve upon the statutory scheme

that Congress enacted into law." *Id.* at 578. A court must "begin [its] search for Congress's intent with the text and structure" of the statute, *id.* at 288, 121 S.Ct. 1511, and cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided. *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 432 (2d Cir. 2002) (quoting *Sandoval*, 532 U.S. at 288). Statutes that focus on the person regulated rather than the individuals protected create "no implication of an intent to confer rights on a particular class of persons."  *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club,* 451 U.S. 287, 294 (1981)). When a statute "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating . . . there [is] far less reason to infer a private remedy in favor of individual persons." *Id.* (internal quotations and citations omitted).

Here there is no indication that Congress intended to create a private right of action to challenge a violation of MUTCD which is incorporated into 23 C.F.R. § 655.603.  The authority for 23 C.F.R. § 655.603 is provided in 23 U.S.C. § 402(a).[2] Section 402(a) is part of the Highway Safety Act, 23 U.S.C. §§ 401 et seq., passed in 1966 for the principal purpose of "enhance[ing] the personal safety of the motoring public." *Miller v. United States*, 710 F.2d 656, 667 (10th Cir. 1983).

---

[2] Section 402(a) provides, in pertinent part, that "[e]ach State shall have a highway safety program approved by the Secretary, designed to reduce traffic accidents and deaths, injuries, and property damage resulting therefrom. Such programs shall be in accordance with uniform guidelines promulgated by the Secretary. Such uniform guidelines shall be expressed in terms of performance criteria. In addition, such uniform guidelines shall include programs  . . . to improve law enforcement services in motor vehicle accident prevention, traffic supervision, and post-accident procedures."

However, such a purpose does not compel a leap to the conclusion that Congress intended to create a private right of action. *Id.* Rather, the "pervading legislative purpose disclosed by the historical materials was to encourage research, development and application of safety measures by a financial incentive system to be executed through the state highway departments." *Miller,* 710 F.2d at 667. Other courts have likewise concluded that there is no private right of action under the Highway Safety Act 23 U.S.C. §§ 402. *See, e.g., Miller*, 710 F.2d at 667-68 (holding that no private cause of action can be maintained under the Highway Safety Act); *Morris v. United States*, 585 F. Supp. 1543, 1547-48 (W.D. Mo. 1984) (plaintiffs could not maintain private cause of action under Highway Safety Act for alleged violation of MUTCD); *Daye v. Com. of Pa.*, 344 F. Supp. 1337 (E.D. Pa. 1972) *aff'd,* 483 F.2d 294 (3d Cir. 1973), *cert. denied*, *Meyers v. Pennsylvania*, 416 U.S. 946, 94 S. Ct. 1956, 40 L. Ed. 2d 298 (1974) (no private cause of action under Section 402(a) of Highway Safety Act and regulations promulgated thereunder); *Cox v. State*, 110 Misc. 2d 924, 443 N.Y.S.2d 141 (N.Y. Ct. Cl. 1981) (same). This Court concurs and here holds that there is no private right of action for an alleged violation of MUTCD as incorporated into 23 C.F.R. §§ 600 et seq. Accordingly, to the extent that Plaintiff's alleges a violation of the MUTCD, such claim is DISMISSED as no private right action exists.

v.   Count 4: CUTPA

Plaintiff alleges in Count 4 of his Amended Complaint that the City has violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b et seq. ("CUTPA"), because the City's conduct "offends basic principles of

fairness." [Dkt. # 32 at ¶ 79]. Plaintiff claims that the City is "stealing" because it is "collecting money in a manner it is not authorized to do so by law." [Dkt. # 59 at 6]. However, Plaintiff's CUTPA claim fails as CUTPA does not apply as the alleged conduct by the City does not fall within the definitions of "trade" or "commerce" as provided in CUTPA.

Conn. Gen. Stat. § 42-110c (CUTPA) provides in relevant part as follows: "exceptions: (a) Nothing in this chapter shall apply to: (1) Transactions or actions otherwise permitted under law as administered by any regulatory board or officer acting under statutory authority of the state or of the United States..." On the basis of this statutory exemption, trial courts in Connecticut have concluded that CUTPA will likely not apply to the majority of conduct by a political subdivision of the state. *Capital Prop. Associates v. Capital City Econ. Dev. Auth.,* X07CV044001293, 2006 WL 302073 (Conn. Super. Ct. Jan. 18, 2006) ("Most trial courts have held that CUTPA is inapplicable to the actions of a governmental entity, as a matter of law, even if that conduct, performed by a private person, might be considered to have commercial overtones.") (collecting cases).

In *Connelly v. Housing Authority,* 213 Conn. 354 (1990) the Connecticut Supreme Court established the standard for determining whether governmental conduct is actionable under CUTPA and counseled courts to consider four factors.   The first factor is whether "the action of the defendant [agency] a creature of statute, are expressly authorized and pervasively regulated" by the state and the federal government.   *Id.* at 361.   The second is whether federal regulations or state law "provide carefully balanced procedural and substantive

remedies."  *Id.* at 362.  The third is whether those regulatory remedies "carefully balance the rights and obligations" of the agency and the claimant which "would be upset by holding that a CUTPA remedy, lacking the procedural prerequisites and specifically tailored" nature applied in addition to those regulatory remedies. *Id.* at 363.  The fourth factor is whether there has been any instance in which the Federal Trade Commission Act has been applied to the conduct in question.  *Id.* at 362.  The court's decision in *Connelly* did not state whether all four factors had to be met in order for municipal action to be exempt from CUTPA.

Applying all four of the factors discussed in *Connelly*, this Court holds that the conduct of which the Plaintiff complains is exempt from liability. First, the City of Hartford and the HPA are creatures of state and local legislative action. The City of Hartford is a Connecticut municipality as defined under General Statutes §§ 7-148 and 7-202, having the power to regulate traffic, public highways and public property.  It has the specific authority to establish regulations for on-street parking.   Conn. Gen. Stat. § 7-148(c)(7)(b) authorizes the City to regulate traffic.  Specifically, it authorizes the city to regulate, not inconsistent with the general statutes, traffic, the operation of vehicles on streets and highways, off-street parking and on-street residential neighborhood parking areas.  The City is also authorized to regulate the use of streets, sidewalks, highways, public places and grounds for public and private purposes.  Conn. Gen. Stat. §7-148(b)(7)(H)(xi). The City also has the power to regulate its property. Conn. Gen. Stat. §7-148(b)(7)(H)(xvi).

The City has the authority to establish a parking authority.  Conn Gen Stat . §7-203. The HPA was established by the City of Hartford pursuant to this authority.  Hartford Municipal Code Chapter 22. As a municipal parking authority, the HPA is authorized by state law to enforce parking regulations in accordance with the terms of such ordinance. Conn. Gen. Stat. § 7-204. "The power to regulate the use of streets and highways by restrictions on the parking of vehicles is one universally recognized, and its reasonable exercise is consistently upheld."  *Cassidy v. City of Waterbury*, 130 Conn. 237, 239 (1943). The power is in the legislature.  It may be delegated by it to its municipal subdivisions. *Id.*  The power to regulate the use of the streets is a delegation of the police power of the state government, and whatever reasonably tends to make regulation effective is a proper exercise of that power.  *Id.*

Indeed, Plaintiff alleges in his amended complaint that the City is a municipality as defined under Connecticut General Statutes §§ 7-148(a), 7-202, having the power to establish regulations for on-street parking.  [Dkt. # 32, Amended Complaint at ¶ 9].  Plaintiff further alleges that the Municipal Code at its Chapter 22, Motor Vehicles and Parking authorizes the City's traffic authority to regulate on-street parking including the authority to install parking meters, designate parking meter zones, fix the zone parking fees and times, designate the hours during which the use of parking meters shall be required. *Id.* at ¶¶10-11.

Second, these municipal regulations provide carefully balance procedural and substantive remedies as evinced by the fact that Plaintiff was afforded, accessed and prevailed in a due process proceeding which resulted in a

37

rescission of the parking penalty.  *See* Hartford Municipal Code 22-25 (providing that an operator of a vehicle which received a parking citation "may contest the violation by appearing at the citation hearing.").  Third, the regulatory remedies demonstrably and thus carefully balanced the rights and obligations of the City and HPA against those of the Plaintiff again evinced by the fact that the Plaintiff prevailed in his due process proceeding.  The imposition of a private right of action under CUTPA would undoubtedly upset this timely, efficient and effective remedy, creating delay and complexity with no apparent benefit.  Fourth, the plaintiff cites and this Court has found no instance in which the Federal Trade Commission Act has been applied to the imposition of a parking fee.  Thus applying all four *Connelly* factors, this Court holds that the City and HPA are exempted from liability under CUTPA for the issuance of a parking fine.

Even applying a traditional CUTPA analysis, the City has no liability under CUTPA because the issuance of a parking ticket is the exercise of police power as stated above and is not the conduct of a trade of business.   A private cause of action under CUTPA arises only if the alleged unfair or deceptive practices "were the conduct of 'trade' or 'commerce.'" *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 726 n.15 (1993). Trade and commerce is defined "as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. § 42-110a. Consequently, not every transaction which might otherwise be called trade or commerce triggers CUTPA.  *Id.*  Here, it is clear that the alleged conduct by the

38

City of Hartford and HPA neither falls within the definition of trade and commerce under CUTPA, nor has Plaintiff's alleged harm derived from a consumer, competitor, or other type of business relationship. "[I]t strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any "trade" or "commerce." *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 725-27 (1993). *See also id.*, at 725-27 n.15. Indeed, the plain language of CUTPA dispels any question as to whether the City's issuance of a parking citation constitutes "trade" or "commerce." The City did not advertise, sell, offer to sell, or distribute any services, property, or anything of value. It issued a parking ticket to a vehicle owner who the City deemed had illegally parked his car.

Moreover, "a CUTPA violation may not arise out of conduct that is merely incidental to the performance of one's trade or commerce." *Cornerstone Realty, Inc. v. Dresser Rand Co.*, 993 F. Supp. 107, 112-13 (D. Conn. 1998) (collecting cases). *See also Brandewiede v. Emery Worldwide*, 890 F.Supp. 79, 81 (D.Conn.1994) (no viable claim under CUTPA for conduct in leasing aircraft where leasing aircraft was incidental to defendant's primary business of providing overnight freight service); *Arawana Mills Co. v. United Technologies Corp.*, 795 F. Supp. 1238, 1253 (D. Conn. 1992) ("defendant's act of leasing property from plaintiff is incidental to the conduct of its *true* business on the Property, the repair and servicing of aircraft engines") (emphasis added).  In the present case, even assuming that the regulation of parking is trade or commerce, it is clear that the distribution of parking tickets to illegally parked cars is no more than "merely

incidental to the performance of" the City's regulation of parking.  For all these reasons, Plaintiff's CUTPA claim must be dismissed as a matter of law.

vi.      **Count 5: Malicious Prosecution/False Arrest**

Finally, Plaintiff claims false arrest and malicious prosecution in Count 5 of his Amended Complaint. Plaintiff claims that the City, "in unlawfully prosecuting Plaintiff . . . without probable cause, committed acts so egregious, so outrageous, as to constitute malicious conduct." [Dkt. # 32 at ¶ 88]. Because it is clear that there was no restriction of physical liberty amounting to false arrest, and that no malice was involved in the City's alleged conduct, this claim must also be dismissed.

"In analyzing claims alleging the constitutional tort of false arrest, [the Second Circuit] ha[s] generally looked to the law of the state in which the arrest occurred."" *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). In Connecticut, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Green v. Donroe*, 186 Conn. 265, 267, 440 A.2d 973 (1982). "[T]he applicable law for these two causes of action is identical." *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392, 682 A.2d 1112 (1996). "To prevail on a claim of false imprisonment, the plaintiff must prove that his physical liberty has been restrained by the defendant and that the restraint was against his will, that is, that he did not consent to the restraint or acquiesce in it willingly." *Berry v. Loiseau*, 223 Conn. 786, 820, 614 A.2d 414 (1992). The restraint must be accomplished "through the exercise of force." *Id*. at 821.   Here, Plaintiff has not

pled a claim that is plausible on its face that Plaintiff's "physical liberty has been restrained" by Defendant, against Plaintiff's will. *Outlaw*, 43 Conn. App. At 392. Rather, Plaintiff was free to go after receiving his ticket and after the hearing. Furthermore, his ticket was dismissed. Therefore, Plaintiff has not suffered any "restraint" or deprivation. Nor has Plaintiff even claimed that his alleged restraint was accomplished "through the exercise of force." *Berry*, 223 Conn. at 820. Thus, Plaintiff's false arrest claim cannot be maintained.

Moreover, courts have repeatedly held that the issuance of a traffic ticket or court summons alone does not constitute a seizure under the Fourth Amendment for the purposes of establishing a false arrest or malicious prosecution claim. "[T]he issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure." *Burg v. Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010). *See also id.*, at 100 ("Plaintiff cannot claim issuance of the traffic ticket effected a 'seizure' because upon appearing to answer the charges in the ticket, he would have been afforded a trial. On the date he was issued the parking ticket, he was 'free to leave.' As a result, plaintiff has no § 1983 claim against [the police officer] for issuance of the ticket. (quoting *DePiero v. City of Macedonia,* 180 F.3d 770, 789 (6th Cir.1999)); *Martinez v. Carr,* 479 F.3d 1292, 1299 (10th Cir.2007) ("[T]he mere issuance of a citation requiring presence at future legal proceedings does not  qualify as a constitutional 'seizure'...."); *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 228 (E.D.N.Y. 2010) *on reconsideration in part,* 814 F. Supp. 2d 242 (E.D.N.Y. 2011)  ("No court has held that a summons alone

constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim." (quoting *Bielanski v. Cnty. of Kane,* 550 F.3d 632, 642 (7th Cir.2008)); *Wang v. City of N.Y.,* Nos. 05 Civ. 4679(AKH), 05 Civ. 5943(AKH), 2008 WL 2600663, at *4 (S.D.N.Y. June 26, 2008) ("In order to show that the tort of malicious prosecution is also a § 1983, or constitutional violation, plaintiff must show some post-arraignment deprivation of liberty. . . . [A] pre-arraignment summons does not constitute a seizure when evaluating a malicious prosecution claims." (internal citations omitted)).  Consequently, Plaintiff cannot maintain a Section 1983 claim for violation of his Fourth Amendment rights as the issuance of a parking ticket does not constitute a seizure within the meaning of the Fourth Amendment.

Additionally, to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law. *Fulton v. Robinson*, 289 F.3d 188 (2d Cir. 2002). In *Lopes v. Farmer*, 286 Conn. 384 (2008), the Connecticut Supreme Court specified the elements for a state law claim of malicious prosecution, as follows: "(1) defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Lopes*, 286 Conn. at 389-90.   Here, Plaintiff has not pled that "the defendant acted with malice,

primarily for a purpose other than that of bringing an offender to justice." *Lopes*, 286 Conn. at 389.  By all reasonable inferences, the City merely issued a parking ticket to a car that appeared to be parked illegally. Further conclusive is the fact that the City dismissed Plaintiff's ticket after the hearing, and Plaintiff did not pay any fine as a result of this incident. Such conduct is not malicious by any stretch of the imagination. Accordingly, Plaintiff's False Arrest/Malicious Prosecution claim must be dismissed.

## CONCLUSION

Based upon the above reasoning, the Defendant City of Hartford's [Dkt. # 52] motion for summary judgment, which the Court construes as a motion for judgment on the pleadings for reasons stated above, is GRANTED as to all claims. All of Plaintiff's claims as alleged in the Amended Complaint [Dkt. # 32] are hereby dismissed.  The Clerk is directed to enter judgment in favor of Defendant and close the case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: August 24, 2012

43